UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | | |
|---|---|---|---|
| TOMMY HUBBARD, | ) | | |
| on behalf of himself and | ) | | |
| all others similarly situated, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | NO. | 2:09-CV-233 |
| | ) | | and |
| ELECTRONIC ARTS, INC., | ) | | 2:09-CV-234 |
| | ) | | |
| Defendant. | ) | | |

# MEMORANDUM OPINION AND ORDER

These matters are before the Court on Tommy Hubbard's ("Hubbard" or "plaintiff") Motions to Remand, [Doc. 14 in 2:09-CV-233 (hereinafter referred to as "*Hubbard I*") and Doc. 17 in 2:09-CV-234 (hereinafter referred to as "*Hubbard II*")]. Also before the Court is Electronic Arts, Inc.'s ("EA" or "defendant") objection to and motion to strike a declaration of Rodney Fort, Ph.D. which the plaintiff submitted in his Combined Reply Memorandum in Support of Motions for Remand. The issue regarding both Motions to Remand is whether the defendant has carried its burden to show that the amount in controversy in each action meets or exceeds the $5 million Class Action Fairness Act ("CAFA") threshold despite plaintiff's disclaimers that the class cannot recover more than $4,999,999.00. *See* 28 U.S.C. § 1332(d)(2). For the

reasons that follow, the Court finds that the defendant has met its burden in both cases, and the Motions to Remand are **DENIED**. This Court reaches this conclusion even considering the information contained in Dr. Fort's declaration.

## I. BACKGROUND

The plaintiff filed *Hubbard I*, an antitrust case, in the Circuit Court for Washington County, Tennessee on September 4, 2009. He sued individually and on behalf of all others similarly situated. The counts charged include Count One, an alleged violation of the Tennessee Trade Practices Act, and Count Two, an unjust enrichment allegation. In sum, the plaintiff claims, "Through unlawful and anti-competitive agreements with the co-conspirators National Football League, the NFL Players Union, Arena Football League and the National Collegiate Athletic Association ("NCAA"), Electronic Arts, Inc. has driven its competition out of the market for interactive football software . . . and has prevented additional competitors from entering the market. As a direct result of these anticompetitive agreements, the price of interactive football software has soared . . . ."[1]

The plaintiff filed *Hubbard II* on September 10, 2009, in the Circuit Court for Washington County. The plaintiff, a current student-athlete at East

---

[1] This case is similar to a case filed in United States District Court for the Northern District of California, *Pecover v. Electronic Arts, Inc.*, No: C08-02820.

Tennessee State University,[2] sued EA "individually and on behalf of current student-athletes in Tennessee who competed for National Collegiate Athletic Association ("NCAA") member colleges or universities on those schools' (1) 'Division I' men's basketball teams; and (2) 'Football Bowl Subdivision' (formerly know until 2006 as 'Division I-A') men's football teams whose names, likenesses, images or identities have been utilized, licensed, or sold interactive videogames and related software products by Defendant." The plaintiff alleges four counts: (1) Count One charges a violation of the Tennessee Trade Practices Act, (2) Count Two charges a violation of the Tennessee Protection of Personal Rights Act of 1984, (3) Count Three charges a violation of Tennessee common law publicity rights, and (4) Count Four charges unjust enrichment.[3]

Plaintiff's counsel filed a related case which is worth noting. Counsel filed *Nuckles, et al. v. National Collegiate Athletic Association* in the Circuit Court for Washington County, Tennessee on September 15, 2009. The plaintiffs were **former** student-athletes who filed on behalf of themselves and others similarly situated. They

---

[2] At the time the Complaint was filed, Hubbard was a current student athlete. The Court notes that it is unclear whether he is still a current athlete. The Court merely notes this fact, considering how plaintiff's counsel decided to divide up the various related class actions he filed. *See Nuckles, et al. v. National Collegiate Athletic Ass'n*, 2:09-CV-235 (suing NCAA by **former** student athletes).

[3] This case is similar to two other cases in the United States District Court for the Northern District of California, *Keller v. Electronic Arts, Inc., et al.*, CV-09-1967, and *Edward C. O'Bannon v. National Collegiate Athletic Ass'n, et al.*, (CV-09-3329).

alleged four counts: (1) Count One charges a violation of the Tennessee Trade Practices Act, (2) Count Two charges a violation of the Tennessee Protection of Personal Rights Act of 1984, (3) Count Three charges a violation of Tennessee common law publicity rights, and (4) Count Four charges unjust enrichment.[4] All of these counts are similar to the counts raised in *Hubbard II*. They differ in the nature of the plaintiffs and the defendants sued.

The plaintiff has carefully worded the complaints in *Hubbard I* and *II* in an attempt to avoid alleging any federal cause of action and to avoid the amount in controversy requirements of diversity jurisdiction. The two Complaints state virtually identical language regarding the amount in controversy.[5] Thus, this Court will set forth the language from *Hubbard I* only. The Complaint states:

> Plaintiff asserts no claim under the law of the United States. The amount in controversy as to the Plaintiff and each individual member of the Proposed Class does not exceed Seventy-four Thousand Nine Hundred Ninety-Nine Dollars ($74,999.00) each, exclusive of interest and costs; and Plaintiff disclaims compensatory damages, punitive damages, declaratory, injunctive, equitable or other relief greater than Seventy-Four Thousand Nine Hundred Ninety-Nine Dollars ($74,999.00) per individual Class member. Further, Plaintiff and members of the Proposed Class limit their aggregate class-wide claims for relief to less than Four Million Nine Hundred Ninety-Nine Thousand Nine

---

[4]This case is also factually similar to *Keller* and *O'Bannon*. *See* n. 3.

[5]The amount in controversy disclaimer in *Nuckles* is also virtually identical.

Hundred Ninety-Nine Dollars ($4,999,999.00) and specifically disclaim compensatory damages, punitive damages, disgorgement, declaratory, injunctive, equitable or other relief greater than Four Million Nine Hundred Ninety-Nine Thousand Nine Hundred Ninety-Nine Dollars ($4,999,999.00).

## II. ANALYSIS

Again, regarding both cases, the plaintiff argues that the defendant did not carry its burden of showing that the amount in controversy is met. To determine whether the amount in controversy has been satisfied, the Court must examine the complaint at the time it was filed. *St. Paul Mercury Indemnity Co., v. Redcap Co.*, 303 U.S. 283 (1938). "[T]he amount alleged in the complaint will suffice unless it appears to a legal certainty that the plaintiff in good faith cannot claim the jurisdictional amount. A plaintiff in a diversity case may defeat removal to federal court by suing for less than the jurisdictional amount." *Id.* at 294. After all, "[i]t is well established that the plaintiff is the 'master of her complaint' and can plead to avoid federal jurisdiction." *Smith v. Nationwide Prop. & Cas. Ins. Co.*, 505 F.3d 401, 407 (6th Cir. 2007) (quoting *Lowdermilk v. U.S. Bank Ntional Ass'n*, 479 F.3d 994, 998-99 (9th Cir. 2007)). Moreover, "[i]t is generally agreed in this circuit, that the amount in controversy should be determined 'from the perspective of the plaintiff, with a focus on the economic value of the rights [she] seeks to protect.'" *Woodmen of the World/Omaha Woodmen Life Ins. Soc. v. Scarbro*, 129 Fed. Appx. 194, 196 (6th

Cir. 2005) (quoting *Buckeye Recyclers v. CHEP USA*, 228 F.Supp.2d 818, 821 (S.D. Ohio 2002)). To be sure, "[a] disclaimer in a complaint regarding the amount of recoverable damages does not preclude a defendant from removing the matter to federal court upon a demonstration that damages are 'more likely than not' to 'meet the amount in controversy requirement,' but it can be sufficient absent adequate proof from defendant that potential damages actually exceed the jurisdictional threshold." *Smith*, 505 F.3d at 407 (6th Cir. 2007) (quoting *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 375 (6th Cir. 2007)).[6]

### A. *Hubbard I* Motion to Remand

As stated, it is incumbent on the defendant in a removal petition to establish that more likely than not the plaintiff's claims meet the amount in controversy requirement. As to *Hubbard I*, after the April 26, 2011 oral arguments on the motion, the parties agreed that the defendant could supplement the record regarding the number of videogames sold in Tennessee. The defendant did so, and the plaintiff did not seek to take a discovery deposition regarding the supplemented information, i.e. the declaration of Jacob Schatz. Thus, the plaintiff does not challenge Mr. Schatz's factual statements as inaccurate.

---

[6]The plaintiff argues that the standard is a legal certainty. However, as this Court stated at oral arguments in this case, Sixth Circuit precedent only requires a demonstration that is it "more likely than not." *See Smith*, 505 F.3d at 407.

In that declaration, Mr. Schatz stated that "since 2005, EA has sold at least 681,497 copies of *Madden NFL* and 258,177 copies of *NCAA Football* to Tennessee retailers for a total of at least 939,674 copies." These figures do not include games sold to GameStop, a national retailer of videogames that distributes in Tennessee and one of the defendant's largest retail partners. The other large partners include Wal-Mart, Best Buy and Target. Mr. Schatz also supplied information regarding sales to Tennessee consumers. Wal-Mart, Best Buy and Target stores sold 185,057 copies of *Madden NFL 10*, *Madden NFL 11*, *NCAA Football 10* and *NCAA Football 11* in 2009 and 2010. These numbers do not include prior editions of *Madden NFL* or *NCAA Football*, and they do not include sales figures for games sold in 2005, 2006, 2007 and 2008.

The Complaint encompasses the time frame of "August 2005 until the final disposition of this matter." In addition, it alleges that EA charged $29.95 for its flagship product *Madden NFL*. It further alleges that after the exclusive agreements entered into by the defendant and alleged co-conspirators and after the effective withdrawal of its only competitor, EA increased the price of the product to $49.99. In addition, the Complaint states that EA "currently sells interactive football software for up to $59.95." Thus, the Complaint effectively alleges that as a result of the

-7-

Case 2:09-cv-00233-JRG-DHI  Document 48  Filed 07/18/11  Page 7 of 19  PageID #: 979

alleged anticompetitve agreements, the overcharge is between $20.00 to $30.00.[7]

Taking the lowest possible amounts, i.e. $20.00 overcharge and 185,057 copies sold, and multiplying them together would yield damages of $3,701,140.00. This falls short of the $5 million threshold. However, this is a very conservative estimate. The overcharge alleged could be as much as $30.00. Also very important to this analysis is the fact that the 185,057 sold underestimates that actual number sold. As stated above, these numbers do not include prior editions of *Madden NFL* or *NCAA Football*, and they do not include sales figures for games sold in 2005, 2006, 2007 and 2008. Furthermore, the number does not include those sold from one of EA's major partners. Considering all of these factors, this Court FINDS that the defendant has shown that it is more likely than not that the amount in controversy requirement is met.[8] Therefore, the plaintiff's Motion to Remand, [Doc. 14] is **DENIED**.

### B. *Hubbard II* Motion to Remand

In order to decide whether the defendant has carried its burden to show

---

[7]At oral arguments, the plaintiff argued that this is not a correct conclusion. The plaintiff argued that other factors come into play. The Court concludes, as it stated at the April 26, 2011 hearing, for the purposes of deciding this Motion to Remand, that the overcharge is $20.00 to $30.00.

[8]The prayer for relief also asks for other amounts including attorneys' fees and costs. *See Brown v. Jackson Hewitt, Inc.*, 2007 WL 642011, at *3 (N.D. Ohio 2007) (noting punitive damages, injunction-related costs, and legal fees are considered in determining amount in controversy in the Sixth Circuit).

-8-

the amount in controversy requirement has been met, the Court must first determine whether *Hubbard II*'s amount in controversy should be aggregated with the amount in controversy in *Nuckles*. The defendant argues that it should; the plaintiff, of course, argues to the contrary.

As stated above, both Complaints disclaim damages over $4,999,999.00. More specifically, the plaintiff argues that adding $4,999,999.00 from *Hubbard II* to the $4,999,999.00 in *Nuckles* more than meets the $5 million threshold. The plaintiff argues that because *Nuckles* was voluntarily dismissed, the issue is moot.

The plaintiffs in *Nuckles* voluntarily dismissed that case on January 29, 2010. However, this fact does not make the issue moot because jurisdiction is determined at the time of removal, and subsequent events, "whether beyond the plaintiff's control or the result of his volition, do not oust the district court's jurisdiction once it has attached." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 293 (1938); *Rogers v. Wal-Mart Stores, Inc.*, 230 F.3d 868, 872 (6th Cir. 2000). *Nuckles* and *Hubbard II* were removed on the same day, October 21, 2009. Thus, the *Nuckles* case was pending at the time of removal. *Nuckles* was not dismissed until the issue of aggregation was raised in the defendant's response. Accordingly, its dismissal may not act as grounds to oust this Court of jurisdiction. Nonetheless, that does not end the inquiry.

To decide the issue, the Court must reconcile two Sixth Circuit cases, *Smith v. Nationwide Property and Casualty Insurance Company*, 505 F.3d 401 (6th Cir. 2007), and *Freeman v. Blue Ridge Paper Products, Inc.*, 551 F.3d 405 (6th Cir. 2009). In both cases, the Sixth Circuit reviewed this Court's decisions on motions to remand in the CAFA context.

In *Smith*, the issue before the Sixth Circuit was whether the "[d]efendant ha[d] failed to demonstrate, by a preponderance of the evidence, that the district court had original jurisdiction over this putative class action by virtue of an adequate amount in controversy." 505 F.3d at 403. The plaintiff had limited the amount in controversy for the entire class to $4,999,999.00. *Id*. The defendant conceded in the case that the amount of compensatory damages sought by the plaintiff would yield less than $5,000,000.00. *Id*. at 407. However, it argued that an award of punitive damages could result in an award in excess of the jurisdictional threshold. *Id*. at 408. The Sixth Circuit recognized that the plaintiff is the "'master of [his] complaint' and can plead to avoid federal jurisdiction." *Id*. at 407 (citing *Lowdermilk v. U.S. Bank National Ass'n*, 479 F.3d 994, 998-99 (9th Cir. 2007)). The court stated, "A disclaimer in a complaint regarding the amount of recoverable damages does not preclude a defendant from removing the matter to federal court upon a demonstration that damages are 'more likely than not' to 'meet the amount in controversy requirement,'

-10-

but it can be sufficient absent adequate proof from defendant that potential damages actually exceed the jurisdictional threshold." *Id.* (citing *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 375 (6th Cir. 2007)). The Court also stated that the jurisdictional analysis also takes into account the possible recovery of punitive damages. *Id.* at 408. The plaintiff did not seek punitive damages in the Complaint but pled only claims for breach of contract. *Id.* Tennessee law applied to the case, and pursuant to that state's law, punitive damages are not recoverable in a breach of contract action. *Id.* Therefore, the Sixth Circuit decided that the amount in controversy was not met, and it upheld this Court's decision that the defendant had failed to carry its burden that the amount in controversy exceeded $5,000,000.00. *Id.*

The Sixth Circuit's decision in *Freeman*, is less clear, and the procedural history of the case is more complicated. In that case, plaintiff sued in state court and alleged nuisance pursuant to North Carolina law, which applied to the case. *Id.* at 406. The plaintiff limited the damages of the putative class to $4,900,000.00. *Id.* The time-frame encompassed in the Complaint was from August 17, 2005, until the date of trial. *Id.* The defendant removed the case, and this Court remanded because the defendant had not shown that it was more likely than not that plaintiff's claims met the amount in controversy requirements. *Id.* at 407. On remand, the plaintiff amended the Complaint and divided the suit into five separate suits, encompassing

-11-

different time frames. *Id*. Each suit covered successive six-month time frames.[9] *Id*. The defendant then removed all suits, and they were consolidated in this Court. *Id*. The plaintiff filed a motion to remand, and this Court granted the motion. *Id*. A split panel of the Sixth Circuit reversed. *Id*. at 410.

The court stated that the jurisdictional threshold "appears to be met" because the five suits must be aggregated. *Id*. at 407. The court pointed out that the plaintiff admitted at oral argument that avoiding CAFA was the only reason for structuring the suits as he did.[10] *Id*. The court stated that CAFA was designed to prevent such artificial structuring to avoid federal jurisdiction. *Id*. Furthermore, the court reasoned:

> Because plaintiffs' suits in the aggregate seek up to $24.5 million, we need not decide the proper standard of proof under CAFA when a plaintiff limits his damages to less than the jurisdictional amount and there is a factual dispute as to the amount of damages for purposes of removal. Instead, this case must be treated as if plaintiffs filed a claim worth up to $24.5 million in state court. In "a suit instituted in a state court and thence removed," plaintiffs' claim of damages exceeding the federal amount in controversy is presumed correct unless shown to a legal certainty that the amount is actually less than the federal standard. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 290-92, 58 S.Ct. 586, 82 L.Ed. 845 (1938);

---

[9]According to North Carolina law, a new cause of action arises each time pollutants are discharged into the river.

[10]This concession was not made to this Court.

-12-

> *Gafford v. General Electric Co.*, 997 F.2d 150, 157 (6th Cir. 1993). "Thus, once the defendant has pointed to an adequate jurisdictional amount, the situation becomes analogous to the 'typical' circumstances in which the *St. Paul Mercury* 'legal certainty' test is applicable . . . ." *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1412 (5th Cir. 1995). Therefore, on remand, if the district court determines to a legal certainty that plaintiffs' claim, as aggregated, does not meet the $5 million amount in controversy requirement, the cases should be remanded.
>
> Our holding is limited to the situation where there is no colorable basis for dividing up the sought-for retrospective relief into separate time periods, other than to frustrate CAFA. We recognize that plaintiffs can avoid removal under CAFA by limiting the damages they seek to amounts less than the CAFA thresholds. Generally, if a plaintiff "does not desire to try his case in the federal court he may resort to the expedient of suing for less than the jurisdictional amount, and though he would be justly entitled to more, the defendant cannot remove." *St. Paul Mercury*, 303 U.S. at 294, 58 S.Ct. 586. But where recovery is expanded, rather than limited, by virtue of splintering of lawsuits for no colorable reason, the total of such identical splintered lawsuits may be aggregated.

*Id.* at 409.

This Court notes that the *Freeman* Court treated the amount in controversy as one for a specific amount and not an indeterminate amount although the Complaints never asked for a specific amount. Thus, it multiplied the top amount disclaimed by the five suits to reach an aggregate amount in controversy of $24.5 million. The Complaints in the *Hubbard II* and *Nuckles* use similar language, and they state that the actual amount of damages will be proved at trial. Nonetheless, this

-13-

Court will follow what the Sixth Circuit did in *Freeman* and will treat it as if the plaintiff specifically sought $4,999,999.00 in each case.

This distinction may or may not be of importance. However, this Court wanted to note how the *Freeman* Court treated these amounts, considering its mention of the standards of proof and the "typical" circumstances surrounding *St. Paul Mercury*'s "legal certainty" test. In such discussion, the *Freeman* Court cited *Gafford v. General Electric Co.*, 997 F.2d 150, 157 (6th Cir. 1993), *overruled on other grounds*, *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1191-94 (2010), and *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1412 (5th Cir. 1995). In *Gafford*, the court discussed the different standards applied depending on the amount in controversy specified or unspecified in a complaint. For example, the legal certainty test is applied where the complaint lists an amount above the jurisdictional threshold. *Gafford*, 997 F.2d at 157. In addition, that case decided that the preponderance standard applies when the complaint sets forth an unspecified amount. *Id*. at 158. This case has not been overturned on these grounds. Furthermore, in *De Aguilar* the court stated that "the legal certainty test . . . contemplate[s] the 'typical' diversity situation." 47 F.3d at 1409. The court further explained, "In a typical diversity situation, the plaintiff files a suit in federal court alleging damages in excess of the jurisdictional amount." *Id*. at n. 6. Thus, even though the *Freeman* complaints did not specify a specific amount,

the *Freeman* court chose the top of the disclaimer, added them together, and in essence stated that this amount was a specified amount. On remand, this Court was to apply the legal certainty test (analogous to a "typical" jurisdictional situation) to determine whether this $24.5 million dollar amount exceeded the $5 million threshold.

Accordingly, as stated above, this Court will treat the $4,999,999.00 disclaimer amount in *Hubbard II* and *Nuckles* as specific amounts. Thus, the question still remains whether these two cases should be aggregated. If they should, then this Court will apply the legal certainty test. If they should not, however, this Court will apply the preponderance test to the amount "specified" in the *Hubbard II* Complaint. This Court stated at the oral argument that this is the test that it would apply, for the Sixth Circuit has not stated with certainty that this Court should apply any other test. The Sixth Circuit intentionally did not decide this issue in *Freeman*, for it stated, "Because plaintiffs' suits in the aggregate seek up to $24.5 million, we need not decide the proper standard of proof under CAFA when a plaintiff limits his damages to less than the jurisdictional amount and there is a factual dispute as to the amount of damages for purposes of removal." 551 F.3d at 409. Moreover, even though there was not a factual dispute over the amount of compensatory damages in *Smith*, the Sixth Circuit did not find that this Court's decision that the defendant did not meet its

burden by a preponderance as reversible error. Furthermore, *Smith* states, "A disclaimer in a complaint regarding the amount of recoverable damages does not preclude a defendant from removing the matter to federal court upon a demonstration that damages are 'more likely than not' to 'meet the amount in controversy requirement,' but it can be sufficient absent adequate proof from defendant that potential damages actually exceed the jurisdictional threshold." *Smith*, 505 F.3d at 407 (6th Cir. 2007) (quoting *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 375 (6th Cir. 2007)). In addition, *Gafford* has not been overturned, and that case specifically adopted the preponderance test when a complaint does not specify an amount of damages.

      Before applying either test to determine whether the amount in controversy requirement has been met in the CAFA context, this Court must first decide whether the cases should be aggregated. It seems that *Freeman* established this new requirement by creating the "colorable basis test." However, the court did not clearly define the test or give instructions on its application. It merely stated that "[b]ecause no colorable basis for dividing the claim has been identified by the plaintiffs other than to avoid the clear purpose of CAFA, remand was not proper." 5511 F.3d at 406. It also did not find the substance of the claim's underlying law to be an adequate reason for "artificially" dividing up the suits by time periods. *Id.* at

-16-

Case 2:09-cv-00233-JRG-DHI   Document 48   Filed 07/18/11   Page 16 of 19   PageID #: 988

408. Again, North Carolina law allows a new cause of action for every trespass injury. Perhaps the most telling reason for this decision is that the plaintiff admitted that avoiding CAFA was the only reason for this structuring. *Id.* at 407. This point is emphasized by the limited nature of the holding. The court stated, "Our holding is limited to the situation where there is no colorable basis for dividing up the sought-for retrospective relief into separate time periods, other than to frustrate CAFA. . . . [W]here recovery is expanded, rather than limited, by virtue of splintering of lawsuits for no colorable reason, the total of such **identical** splintered lawsuits may be aggregated" *Id.* at 409 (emphasis added). Thus, despite the plaintiff being the master of his complaint, and despite a legitimate reason for "structuring" the lawsuits on remand the way plaintiff's counsel did, i.e. substantive law allowing such, the court focused instead on the breaking up of time periods in cases of identical natures to avoid CAFA.

It seems that the only way to reconcile *Smith* and *Freeman* is that the plaintiff, in essence, is not the so-called master of his complaint if he specifically drafts it to avoid CAFA by "splintering" identical lawsuits by time. Thus, drafting a complaint this way divests him of the benefit of choosing his forum by disclaiming damages over the jurisdictional threshold. However, he is the master of his complaint and can specifically plead to avoid federal jurisdiction by using disclaimers to limit

the amount in controversy any other time.

In *Hubbard II* and *Nuckles*, plaintiffs' counsel has perhaps learned from his mistake in *Freeman* and has not admitted that the only reason for structuring the suits as he did was to avoid federal jurisdiction. Although he did break the suits up according to time, i.e. current student-athletes and former student-athletes, he also sued different defendants. Nevertheless, he alleges in both suits that the same entities are members of essentially the same conspiracy. He also alleges all of the same counts. Plaintiff briefly addressed the aggregation issue in his response, and he merely argues that the plaintiffs and defendants are different and that *Freeman* is distinguishable. However, he did not attempt to actually distinguish *Freeman*. At the hearing, the plaintiff argued that the case begins and ends with *Smith*. He also argued that *Hubbard II* and *Nuckles* were divided in such a way to avoid confusion and because the NCAA does not have a defense as to former players.[11] Nonetheless, the defendant points out that plaintiff's counsel is co-counsel in a similar case in California in which a nationwide class has been certified for necessarily the same conspiracy pursuant to California law. Plaintiff's counsel argued in that case that the cases of the current athletes and the former athletes were sufficiently similar for

---

[11]This Court is also concerned about the fluid movement of the plaintiffs from one class to another once one graduates. As stated earlier, that may be the exact situation with Mr. Hubbard.

Case 2:09-cv-00233-JRG-DHI  Document 48  Filed 07/18/11  Page 18 of 19  PageID #: 990

consolidation. *See* Defendant's Opposition to Remand Motions, pg. 18 n. 46.

For the reasons just stated, this Court FINDS that *Hubbard II* and *Nuckles* are identical suits splintered by time for no other legitimate purpose other than to avoid federal jurisdiction. Accordingly, the amounts in controversy are aggregated to total nearly $10,000,000.00. As such, this Court applies the legal certainty test, and further FINDS that the test has been met. Thus, the motion to remand in *Hubbard II* is **DENIED**. Considering this ruling, the Court need not reach the issue without aggregation.

### III. CONCLUSION

For the reasons stated above, the Motions to Remand, [Doc. 14 in 2:09-CV-233 and Doc. 17 in 2:09-CV-234], are **DENIED**. Because they are denied, the plaintiff's request for attorney's fees is also **DENIED**. Defendant's motions to strike the declaration of Dr. Fort, [Doc.19 in No. 2:09-CV-233 and Doc. 25 in No. 2:09-CV-234], are DENIED.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
